**In re CUMBERLAND FARMS, INC., Debtor.**

**Bankruptcy No. 92–41305–JFQ.**

United States Bankruptcy Court, D. Massachusetts.

May 1, 1992.

Don S. DeAmicis, Ropes & Gray, Boston, Mass., for Real Estate Lenders Committee.

Timothy Lindamood, Sullivan & Worcester, Boston, Mass., for debtor.

## OPINION

JAMES F. QUEENAN, Jr., Chief Judge.

The Real Estate Lenders Committee (the "Lenders Committee") moves for authority to employ Ropes & Gray (the "Firm") as counsel to the Lenders Committee effective as of May 28, 1992. Set forth here are my findings of fact and conclusions of law. The permissibility of such employment presents a novel question.

Cumberland Farms, Inc. (the "Debtor") is engaged in several related businesses. Under the trade name of "Gulf" it sells gasoline at retail in the northeast plus Ohio and Florida through some 2700 gasoline stations. Under its own trade name, it operates food convenience stores in the same market area at about 1,000 locations, of which about 650 have the Debtor's gasoline stations in front. The Debtor owns substantially all of its gasoline and convenience store locations. It also sells gasoline at wholesale and home heating oil at retail. These latter operations are facilitated by an affiliate's ownership of an oil refinery. Finally, the Debtor owns and operates a dairy and a bakery through which it supplies its own convenience stores and sells products to independently owned stores under private labels.

Many of the Debtor's real estate properties are encumbered by mortgages held by some seventy-seven lenders (the "Lenders"). They are the creditors now represented by the Lenders Committee. Prior to the filing of the chapter 11 petition, the Debtor fell behind in its payments to many of the Lenders, although it remained current on its trade debt. As a result, it entered into negotiations with the Lenders. To facilitate these negotiations, the Lenders formed a committee composed of those owed the larger loan balances.

Following the filing of the chapter 11 petition, the United States Trustee appointed the Lenders Committee at the request of several of the Lenders. The Debtor opposed that request. Eight of its nine members are lending institutions. The ninth, Graimark Realty Advisors, is the assignee of claims held by The Resolution Trust Company. With perhaps some minor overlapping, the mortgages held by each Lender cover real estate not included in the mortgages of the other Lenders. The aggregate indebtedness owed the Lenders is approximately $245,000,000. Some portion of this figure may well be unsecured due to deficiencies in real estate values.

The unsecured trade debt totals approximately $40,000,000. The United States Trustee has appointed an Unsecured Creditors' Committee (the "Unsecured Committee"). That committee has retained as its counsel Pepper, Hamilton & Scheetz, a law firm enjoying a national reputation in the representation of committees. The Unsecured Committee has employed Price Waterhouse as its accountant.

I conclude, for five largely independent reasons, that the requested employment should be denied. First, the employment would bring no benefit to the bankruptcy estate because neither the Lenders Committee nor the Firm would perform any function essential to the reorganization which is not performed by the Unsecured Committee. The Unsecured Committee and its counsel are obligated to perform four basic functions: (i) monitoring the Debtor's business operations to be sure that the operations are enhancing the chances of a successful reorganization, (ii) monitoring the Debtor's activities in representing the estate, particularly in court proceedings, to be sure that those activities are beneficial to the estate and promotive of a successful reorganization, (iii) negotiating with the Debtor on the Debtor's chapter 11 plan, (iv) where the Debtor has a conflict of interest or is derelict in its duties, representing the estate in specific

matters after court authorization. Prior to the petition filing, the predecessor to the Lenders Committee may have performed the first two of these functions. There is no sense in the Lenders Committee performing any of these functions during the chapter 11 case now that the Unsecured Committee is in place. Moreover, to the extent that any of the Lenders are unsecured by reason of deficiencies in their mortgage values, the Lenders derive benefit from the activities of the Unsecured Committee as well as that Committee's counsel and accountant.

Second, the interests of the Lenders are so largely individualistic that their interests are only minimally advanced by a collective representation. Unlike an unsecured creditor who looks only to general estate assets for payment, a Lender looks primarily to its own collateral for payment. Although a Lender may well prefer gradual (and possibly full) payment through reorganization rather than immediate payment through foreclosure, the Lender's prime concern is with its own collateral. That concern distinguishes a Lender from an unsecured creditor. It is not well served by a committee and its counsel who are equally obligated to advance the mortgage interests of other Lenders. The Lenders lack of commonality of security interests is simply inconsistent with any collective representation of their secured claims. *See In re Wekiva Development Corp.*, 22 B.R. 301 (Bankr.M.D.Fla.1982) (appointment of secured creditors' committee denied because interests of secured creditors are rarely identical). The circumstances here are quite different from the situation where a number of lenders share common collateral. There a secured lenders committee serves the security interests of all. And there the expenses of committee counsel are properly added to the debt to the extent permitted by section 506(b) rather than being paid from unencumbered estate property, which is the requested source of any payment to the Firm.

Third, if there is any minimal benefit that can be provided by the Lenders Committee and its counsel, the benefit flows to the Lenders and not to the bankruptcy estate. The Lenders Committee and its counsel may, for example, develop through their collective wisdom an effective strategy to combat a proposed cramdown of their secured claims under section 1129(b)(2)(A). That strategy would help them but not the estate whose funds pay the Firm. There is no analogy here to the plan bargaining activities of counsel to the Unsecured Committee. The estate pays for those services because unsecured creditors are its prime beneficiaries.

Fourth, many of the proposed services of the Firm are duplicative of the services that will be performed by either counsel to the Debtor or counsel to the Unsecured Committee; at best they have a tangential relationship to the security interests of the Lenders. The motion sets forth the following among the services that the Firm would perform:

a. the examination of the officers and directors of the Debtor and other parties affiliated with the Debtor with respect to the assets, liabilities and operations of the Debtor;

b. the identification of claims and causes of action which should be prosecuted by the Debtor and the identification and prosecution of such claims and causes of action as may be asserted by the [Lenders] Committee;

c. the examination of proofs of claim to be filed in this case;

. . . . .

f. analyzing, at the [Lenders] Committee's request, any actions between and among the Debtor, its affiliates, its creditors and any insiders of the Debtor which the [Lenders] Committee believes warrant analysis or investigation;

g. analyzing any and all bids submitted for all or part of the Debtor's property;

. . . . .

i. appearing before the Bankruptcy Court in connection with matters relating to the administration of the estate;

j. objecting or assenting to motions brought before the Court in these cases whether by the Debtor or otherwise;

At the hearing, I pointed out the duplicative nature of these activities. The Firm

took the curious position that it would not perform the enumerated services to the extent they are duplicative, but that it did not want to have its activities "circumscribed" at the outset by eliminating this portion of the description of its proposed services. That makes no sense. The Firm also suggested that I could resolve the problem by not compensating it for duplicative services when it later applies for compensation. Not only may that be unfair to the Firm, it may also be improper given the listing of these services in the employment motion. Experience teaches, moreover, that services of professionals tend to be somewhat holistic, making their division into neat categories quite difficult at the time of awarding compensation. Experience also teaches that counsel seldom show restraint concerning their activities in a "big" case.

Fifth, even if one can glean any potential benefit to the estate from the proposed services of the Firm that are neither redundant to those of counsel to the Debtor or counsel to the Unsecured Committee, nor tangential to the security interests of the Lenders, that benefit would be dwarfed by what will clearly be a huge legal bill. For example, presumably one of the first tasks of the Firm would be to familiarize itself with the mortgaged properties. This means acquiring knowledge concerning hundreds of different properties. The expense of that task alone would likely be staggering. Surely the estate would derive no benefit from this or similar tasks which would even approach the cost of the services.

In summary, the Firm would serve no function that could possibly benefit the bankruptcy estate by even a fraction of the likely cost to the estate for its services. No motion is before me concerning the propriety of the appointment of the Lenders Committee. I therefore leave that appointment undisturbed.

For many of the reasons set forth here, I have by separate order also denied the request of the Lenders Committee for the appointment of Arthur Andersen as its counsel. Denial of the authority to employ professionals will not, however, result in the Lenders Committee receiving insufficient information concerning the Debtor's business operations or activities in the case. At the request of the Lenders Committee, I will schedule a hearing for the purpose of devising a system to facilitate the furnishing of information to the Lenders Committee. Prior to any such hearing, I expect the Unsecured Committee and the Debtor, with their counsel and accountants, to meet with the Lenders Committee to attempt to work out a consensual arrangement. I can see no reason, for example, that much of the data supplied by Price Waterhouse to the Unsecured Committee could not also be supplied to the Lenders Committee. The Debtor can also be required to furnish information directly to the Lenders Committee. Lenders who are undersecured, moreover, are entitled to have their unsecured claims benefit from the services of the Unsecured Committee and its professionals.

The Lenders may of course agree that they will bear the expense of counsel to the Lenders Committee in whatever proportion may be agreeable to all or some of them. Alternatively, the Lenders Committee may decide to disband and have the flow of information go directly to individual Lenders who would retain their own counsel.

### ORDER

Upon the motion of the Real Estate Lenders Committee for authority to employ Ropes & Gray as counsel, the court having today issued separate findings of fact and conclusions of law, it is accordingly

ORDERED, that the motion is DENIED.