**In re DOW CORNING CORPORATION, Debtor.**

**Bankruptcy No. 95–20512.**

United States Bankruptcy Court,
E.D. Michigan,
Northern Division.

March 21, 1996.

Barbara J. Houser, Sheinfeld, Maley & Kay, P.C., Dallas, TX, for Debtor.

### OPINION ON VARIOUS MOTIONS FOR ORDERS TO APPOINT ADDITIONAL COMMITTEES OR TO MODIFY THE COMPOSITION OF EXISTING COMMITTEES

ARTHUR J. SPECTOR, Bankruptcy Judge.

### I. Introduction

The issues to be decided in these contested matters include:

1. Whether the existing committees adequately represent the interests of the moving parties.

2. Does the Court have any power to reconstitute a committee and, if so, how extensive is it?

3. If the Court has some power to reconstitute a committee, what deference should be given the United States trustee's designation of the committee members?

4. Are attorneys for creditors eligible to be members of an official committee?

This opinion deals with construction of § 1102 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*,[1] which, in pertinent part, reads:

(a)(1) Except as provided in paragraph (3), as soon as practicable after the order for relief under chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate.

(2) On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee.

. . . . .

---

1. Unless otherwise noted, all statutory references are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

**126**

(b)(1) A committee of creditors appointed under subsection (a) of this section shall ordinarily consist of the persons, willing to serve, that hold the seven largest claims against the debtor of the kinds represented on such committee, or of the members of a committee organized by creditors before the commencement of the case under this chapter, if such committee was fairly chosen and is representative of the different kinds of claims to be represented.

.    .    .    .    .

Dow Corning Corporation (the "Debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on May 15, 1995. As required by § 1102(a)(1), the United States trustee appointed an Official Committee of Unsecured Creditors ("U/S CC") on May 31, 1995. The following day, the United States trustee exercised his discretion under § 1102(a)(1) and appointed an additional committee—the Official Committee of Tort Claimants ("TCC").

The United States trustee named these "persons" to the committees:

TCC: Michael T. Gallagher, Esq.
Fisher, Gallagher & Lewis, LLP
    Margaret Moses Branch, Esq.
    The Branch Law Firm
    Ralph I. Knowles, Jr., Esq.
    Doffermyre, Shields, Canfield & Knowles
    Sybil Niden Goldrich
    Tommy Jacks, PC
    Mithoff & Jacks, LLP
    Sybil Shainwald, Esq.
    Law Offices of Sybil Shainwald
    Elizabeth J. Cabraser, Esq.
    Lieff, Cabraser & Heimann
    Stanley M. Chesley, Esq.
    Waite, Schneider, Bayless & Chesley Co., LPA
    John O'Quinn, Esq.
    O'Quinn, Kerensky, McAninch & Laminack

U/S CC: Alan Sidiane [sic—"Sidrane"]
    Credit Lyonnais
    F.A. Zagar

    Bank of America NT & SA
    James Cornell, Esq.
    OSI Specialties, Inc.
    V.P. and General Counsel
    Thomas J. Moloney, Esq.
    Nippon Life Insurance Co.
    Cleary, Gottlieb, Steen & Hamilton
    Jan Kofol
    Credit Suisse

On June 26, 1995, the United States trustee, acting on his own initiative, modified the makeup of the U/S CC so that the committee now consists of the following members:

    Alan Sidrane
    Credit Lyonnais
    F.A. Zagar
    Bank of America NT & SA (subsequently resigned)
    James Cornell, Esq.
    for OSI Specialties, Inc.
    V.P. and General Counsel
    Thomas J. Moloney, Esq.
    for Nippon Life Insurance Co.
    Cleary, Gottlieb, Steen & Hamilton
    Jan Kofol
    Credit Suisse (subsequently resigned)
    David G. Sampson
    The Bank of New York
    Matthew G. Murphy
    The Dai–Ichi Kangyo Bank, Ltd.
    New York Branch
    Frederick H. Moryl, Jr.
    Banque Nationale De Paris
    Chicago Branch
    Howard L. Siegel, Esq.
    for Globe Metallurgical, Inc.

Hundreds of persons requested to be placed on the committees. And at least one, United Steelworkers of America, AFL–CIO, CLC (the "Union"), pressed its interest on the United States trustee after the assignments had been made. According to allegations contained in its motion, as more fully addressed below, on June 2, 1995, the Union requested that the United States trustee add it to the Unsecured Creditors' Committee.

When the United States trustee refused, the Union asked him to reconsider on July 6, 1995.

On June 28, 1995, the Medical Protective Company moved for the appointment of a committee of physician claimants. The request was made on behalf of a nationwide consortium of physician liability insurers and approximately 1,000 insured physicians who are defendants in over 7,800 lawsuits arising from the implantation of Dow Corning silicone and silicone gel breast implants.

On July 5, 1995, an Unofficial Committee of Unsecured Vendors filed a "Motion for Order Requiring Appointment of Official Unsecured Vendors' Committee."

On July 12, 1995, Reagan W. Silber, an attorney representing 4,000 Australian breast implant claimants and members of two class actions pending in the Canadian provinces of Quebec and Ontario, filed a motion[2] requesting the Court to "appoint a separate committee, or, in the alternative, expand the existing Tort Claimants Committee." Corrected Motion for Appointment, p. 13. He nominated himself to be the additional TCC member. This motion drew supporting comments by: a firm of British solicitors for 436 British tort claimants, one of whom also nominated himself to sit on the TCC; a Canadian firm representing tort claimants from Canada; and a solicitor from Australia representing approximately 300 Australian breast implant claimants.

On September 18, 1995, the Union, the exclusive collective bargaining representative of the Debtor's hourly employees, moved for the appointment of an employment-related creditors' committee; to appoint a retiree health care claimants' committee, or to appoint the Union to the Unsecured Creditors' Committee.

Finally, on October 10, 1995, a collection of 84 health benefit plans filed a "Motion for Appointment of a Representative of Subrogation Tort Claimants to the Tort Claimants Creditor Committee."

The Debtor, both official committees, and the United States trustee filed pleadings objecting to all of these motions.[3] The only motion which received comments from other than the primary participants was the one filed by the Australian and Canadian tort claimants. Though the motion drew supporting comments, it also drew the ire of something called the "Foreign Plaintiffs' Subcommittee." This subcommittee is apparently involved in an official or semi-official capacity in the proceedings entitled "In re: Silicone Gel Breast Implants Product Liability Litigation MDL 926, Northern District of Alabama." The three officers listed on that subcommittee's letterhead signed a letter of objection,[4] which (as is routinely done with letters addressed to a judge presiding over a case) was filed as a pleading. The chair of the subcommittee, Ms. Shainwald, a co-signator of the letter, is herself a member of the TCC. And Lewis J. Saul, a co-vice-chairperson of the subcommittee, sent his own separate letter of objection.

### A. The Motions

All of the motions alleged that the current committees do not adequately represent the interests of the movants. The vendors point to the fact that of the [then nine, now seven]

2. Mr. Silber originally filed the motion on June 30, 1995, but it was stricken for procedural infirmities. A "Corrected Motion" was eventually filed on July 12, 1995.

3. On March 1, 1996, the TCC withdrew its objection to the appointment of a separate physicians' committee.

4. For reasons unknown, attorneys, such as those people who sent this letter, (who therefore ought to know better), have adopted the peculiar habit of mailing substantive correspondence to the presiding judge instead of addressing the Court through pleadings or on the record in open court. In this case, the notation at the end of the Subcommittee's letter discloses that this correspondence, which was clearly a response to a filed motion, was sent to parties friendly to the response, but not to the movant. Does the prohibition on "ex parte communication" mean anything? See F.R.Bankr.P. 9003.

As stated above, these correspondents are not the only ones who have adopted this peculiar method of requesting relief from the Court. Such a practice must cease. In the future, instead of directing that such letters be filed in the court file, I might direct the clerk to file them in the round file. Alternatively, I reserve the right to show cause the sender for violating Rule 9003.

members of the U/S CC, only two are trade vendors. They claim that two members are too few to play a meaningful role in the U/S CC, and that trade creditors have a different perspective on reorganization than institutional creditors.

The Australian and Canadian tort claimants' complaint is far more passionate, for it appears that the movant and most of the members of the TCC have a "history." They were all involved as plaintiffs' attorneys in the MDL 926 litigation and their disputes there apparently led to hard feelings. The movant alleges that the members of the MDL Plaintiffs' Steering Committee tried to sell out the interests of the foreign tort claimants. Since four of the 19 members of that steering committee—Ralph Knowles, Stanley Chesley (co-chairs of the Steering Committee), Margaret Moses Branch, and Elizabeth J. Cabraser[5]—are part of the nine-member TCC, the movant has no faith in that committee to safeguard the interests of the foreign tort claimants. Moreover, the movant says that the one member of the TCC who arguably might be interested in the foreign claimants, Ms. Shainwald, represents both domestic and foreign claimants and that she, too, sold out the foreign tort claimants in the course of the MDL. The movant also asserts that foreign tort claimants represent a large segment of the total number of tort claimants because about half of all breast implants manufactured by the Debtor were sold outside the United States. Thus, he asserted, foreign tort claimants are underrepresented on the TCC, and at a minimum ought to have another member—namely himself.

The physicians argue that their position is totally unrepresented by either committee. Since these doctors are being sued by tort claimants for implanting an allegedly defective product, the TCC is not likely to act in their behalf. Their motion also alleges that the indemnification and/or contribution claims that the physicians may assert against the Debtor are not the type that the U/S CC,

made up entirely of commercial claimants, is inclined to support.

The Union alleges that it (and/or its 600 members and 400 retirees) holds one of the largest, if not the largest, unsecured claim against the Debtor, arising from retiree health care benefits, damages for breach of a collective bargaining agreement, etc. It has no representation on either committee.

The 84 health insurance plans assert a claim against the Debtor to the extent that they have paid benefits to or for a person whose medical condition arose out of use of the Debtor's product and who fails to file a proof of claim. In that event, pursuant to § 509(a), the insurer would file a claim on that party's behalf because, pursuant to the terms of many of the health insurance policies, the insurer is allegedly entitled to recover the cost of benefits paid to an insured from any recovery obtained by the insured from a tortfeasor, such as the Debtor. These insurers claim that the TCC is made up of attorneys who, outside the context of this case, have opposed their attempts to enforce these rights against their clients. Accordingly, they cannot expect them, in the role of the TCC, to fight for their rights and against the interests of their own clients.

### B. The Responses

The following objections raise a number of arguments which apply to all of the motions. The respondents state that the existing committees have fiduciary obligations to claimants who belong to factions lacking membership on the committees; that the committees share common interests with the moving parties in obtaining the maximum recovery from the Debtor; that even if the interests of the movants might in some ways conflict with the interests of current committee members, it is appropriate that committees deal with diversity and conflicting interests; that with respect to the request to alter the membership of the committees, the Court is without power to do so; and creating additional committees would be costly and counter-productive.

---

5. Sybil Shainwald also apparently had some involvement on the Steering Committee, as she   was the chair of one of its subcommittees.

Furthermore, with respect to the vendors' motion, the respondents allege that the motion fails to offer any factual support for the assertion that the U/S CC cannot adequately represent the vendors' interests; no conflict currently exists; the number of vendors on the committee is appropriate given the relative size of the institutional lenders' and the vendors' claims; and the vendors have no need for a new committee inasmuch as they are already organized into an unofficial committee doing an admirable job.

Objections specific to the motion by the consortium of physicians, are that the physicians' claims are contingent and are subject to disallowance pursuant to § 502(e)(1)(B); the physicians' claims, once they ripen into actual claims, will be no different than any other unsecured claim and therefore are adequately represented by the current U/S CC; and the physicians are already adequately and ably represented by the consortium.

The responses to the motion by the 84 health benefit plans cite the fact that the plans are unidentified, and thus violate F.R.Bankr.P. 2019; they have not proven that they have subrogation rights; a right to reimbursement from another tort claimant is not itself a claim against the Debtor; they failed to request the United States trustee to provide the relief they now request from the Court; and the motion is untimely.

The specific responses to the foreign tort claimants' motion include that the foreign tort claimants are already well represented on the TCC;[6] the movant's factual recitation of the history of the MDL litigation is incorrect; even if not, complaints about the global settlement which arose out of the MDL litigation are moot due to the collapse of that settlement; and foreign tort claimants represent only a small percentage of the universe of tort claimants.

With respect to the Union's motion, the specific responses are that the Union and its members are not really creditors because at present, the Debtor has not breached, modified or attempted to breach or modify the terms of any collective bargaining agreement or retiree benefits plan; as a result, § 1114 is inapplicable. Additionally, even if claims currently exist, they are adequately represented by the U/S CC because, as the Union acknowledges, the vast bulk of such claims would be general unsecured, non-priority claims. With respect to any priority claims, such as wages or post-retirement health care, they are already adequately protected by statutory mandate and there is therefore no need for a committee. The respondents also point to the fact that the Debtor, with the cooperation of the existing committees, has been vigilantly protecting its employees from the inception of this case. Finally, the respondents say that the Union is already an adequate advocate for the rights of its members.

This is a core proceeding, 28 U.S.C. § 157(b)(2)(A), which is within the jurisdiction of the Court, 28 U.S.C. § 1334(a).

## II. Scope of Court's Authority

■ There is nearly unanimous agreement that the bankruptcy court has *de novo* power to order the United States trustee to appoint one or more additional committees. *See, e.g., In re Sharon Steel Corp.,* 100 B.R. 767, 785 (Bankr.W.D.Pa.1989); *In re First Republic-Bank Corp.,* 95 B.R. 58, 59 (Bankr.N.D.Tex. 1988); *In re Texaco, Inc.,* 79 B.R. 560, 566 (Bankr.S.D.N.Y.1987); *In re McLean Industries, Inc.,* 70 B.R. 852, 856–57 (Bankr. S.D.N.Y.1987); 5 *Collier on Bankruptcy,* ¶ 1102.02 (15th ed. 1996) ("[T]he bankruptcy court's consideration of the issues presented by a motion under § 1102(a)(2) is not limited to a review of any prior determination made by a United States trustee with respect to a request for the appointment of an additional committee. The limitation applicable to the scope of review of administrative determinations under Section 10(e) of the Administrative Procedure Act is not applicable when substantive legislation or its legislative history authorizes a *de novo* court hearing."). The lack of any real dispute on this point must owe to the fact that § 1102(a)(2) plainly

---

**6.** Ms. Shainwald is said to represent about 250 foreign breast implant claimants. Apparently she is not alone in this respect. It is claimed that

Mr. O'Quinn, Ms. Branch, Mr. Gallagher and Ms. Cabraser also have foreign clients.

says that "the court may order the appointment of additional committees" without reference to a standard of review applicable to the United States trustee's prior determination. Indeed, even the United States trustee conceded this point. *See* "United States Trustee's Comments Regarding Alteration of Tort Claimant Committees and Citation of Authorities" (hereafter "Comments"), p. 12.

Much more problematic are the issues of whether a court has the power to alter the composition of existing committees by adding or deleting one or more members, or to disband an existing committee altogether and order the United States trustee to appoint a different one.

> No issue involving creditors' committees has been the subject of as much concern as the ability to alter the composition of a committee. Unfortunately, no other body of law governing creditors' committees appears to be in such a current state of disarray. With almost no guidance from Congress or the appellate courts, the bankruptcy courts have been left to fashion rules regarding the removal and addition of committee members. As a consequence, the case law does not represent a seamless web, but rather more of a disjointed patchwork of decisions that cannot be reconciled easily.

Kenneth N. Klee, K. John Shaffer "Creditors' Committees Under Chapter 11 of the Bankruptcy Code," 44 S.C.L.Rev. 995, 1032 (Summer, 1993) (hereafter "Klee & Shaffer").

The case law on this point breaks down into three camps. One of the camps argues that a court is generally powerless to affect the makeup of a committee appointed by the United States trustee. *See, e.g., In re Hills Stores Co.,* 137 B.R. 4, 8 (Bankr.S.D.N.Y. 1992); *In re Drexel Burnham Lambert Group, Inc.,* 118 B.R. 209, 210–11 (Bankr. S.D.N.Y.1990).[7] The second camp states that the authority to alter a committee's composition vests entirely with the court, which is to make its determination on a *de novo* basis. *Sharon Steel,* 100 B.R. at 785–86; *In re Public Service Co. of New Hampshire,* 89 B.R. 1014, 1021 (Bankr.D.N.H.1988); *Texaco,* 79 B.R. at 566. The third camp takes the middle ground, by maintaining that the court can order the United States trustee to alter committee membership, but that it can only do so upon a finding that the United States trustee's original appointment was either arbitrary and capricious or an abuse of discretion. *In re Columbia Gas Sys., Inc.,* 133 B.R. 174, 176 (Bankr.D.Del.1991); *First RepublicBank,* 95 B.R. at 60.[8] The United States trustee endorses this view.

The only real argument for the first camp is that in 1986, Congress amended § 1102 to delete what was previously an express power of the court to change the makeup of existing committees. *Hills Stores,* 137 B.R. at 8; *Drexel Burnham,* 118 B.R. at 210–11. However, the overwhelming majority of cases, for good reason, recognize that a court does have the power to alter a committee.

> [I]f a request to the United States trustee to change the membership of the committee fails, or if there is an objection to the act of the United States trustee, there must be the ability to resort to the court; absent very specific and direct language, one should not conclude that Congress had any intention to exclude the court from

---

7. Both of these courts suggested, without elaboration, that there may nevertheless be circumstances when a court would possess some measure of authority to reconstitute a committee. *Hills Stores,* 137 B.R. at 8; *Drexel Burnham,* 118 B.R. at 211 n. 1. Thus there appears to be no case which unequivocally states that a bankruptcy court has no role to play in regard to this issue.

8. A related issue is whether the court can order the addition to or removal from the committee of particular persons, or must, having decided that alteration is necessary, then defer to the U.S. trustee in designating the parties to be added or removed. *Compare In re Plabell Rubber Prods.,* 140 B.R. 179 (Bankr.N.D.Ohio 1992) (court directly appointed a new member to an existing committee) *with In re Public Service Co. of New Hampshire,* 89 B.R. 1014, 1021 (Bankr.D.N.H. 1988) (court deferred to the U.S. trustee). *See also Hills Stores,* 137 B.R. at 8 ("While I may order the appointment of additional *committees* under § 1102(a)(2) of the Code, the statute no longer permits the addition or deletion of *members* of committees by the court...."). Although the determination of this is issue is not crucial, the Court agrees with the position stated in *Public Service Co. See infra* at 146.

those able to change committee membership for appropriate reasons.

*In re Plabell Rubber Prods.*, 140 B.R. 179, 180 (Bankr.N.D.Ohio 1992) (citing *Collier on Bankruptcy*, ¶ 1102.01 (15th ed. 1992)). *See also Columbia Gas System*, 133 B.R. at 176; *Sharon Steel*, 100 B.R. at 776; *First RepublicBank*, 95 B.R. at 60; *Public Service Co.*, 89 B.R. at 1021.

To begin with, those who deny the court's authority to alter the composition of a committee fail to adequately recognize that even the United States trustee lacks statutory authority to alter the makeup of a committee. (But the lack of such express statutory authorization did not seem to stop the United States trustee from doing that very thing in this case: he added four members to the U/S CC on his own on June 26, 1995.) Since there is no statutory method for changing the composition of a committee once the United States trustee has appointed its members, there is also no reason to believe that the court, pursuant to its powers under § 105(a), should not fill that statutory void when alteration becomes necessary.[9]

Another argument supporting a court's authority to at least order the United States trustee to alter the membership of an existing committee is the fact that such a remedy is far less drastic than an order to the United States trustee to appoint an entirely new committee. *Public Service Co.*, 89 B.R. at

1021 ("[T]he court necessarily has the inherent power to provide 'a lesser included remedy' of simply directing expansion of the existing committee."). In the context of this case, for example, if the Court granted the vendors' motion to appoint a separate vendors' committee, it would have the side effect of forcing the two vendor members off the U/S CC. Since the Court already has *de novo* authority under § 1102(a)(2) to create a vendors' committee—which action would automatically cause the alteration of an existing committee—it makes no sense to state that it cannot perform the lesser task of simply altering the existing committee.

Furthermore, there does exist some textual basis for a court to at least disband a committee appointed by the United States trustee. Rule 2007(c) provides that "the court shall direct the United States trustee to vacate the appointment of the committee and may order other appropriate action if the court finds that such appointment failed to satisfy the requirements of § 1102(b)(1) of the Code." While it is true that Rule 2007 pertains to the United States trustee's appointment of "a committee organized by creditors before the commencement of a ... chapter 11 case ...," F.R.Bankr.P. 2007(a), there are two reasons to analogize to this rule.

First, the United States trustee's action in appointing at least four of the 19 members of the existing prepetition committee of credi-

**9.** In his Comments, p. 9, the U.S. trustee claimed: "The addition or removal of a committee member is committed to the discretion of the U.S. Trustee." Unfortunately, he failed to cite any statute so providing. The only place the United States trustee can look for any hint of Congressional authorization allowing him to replace a deceased or retiring member of an official committee, or to name one or more additional members, or to remove a member is 28 U.S.C. § 586(a)(3)(E)—the "monitoring creditors' committees appointed under title 11" provision. But to "monitor" means "to observe, record, or detect ... to observe critically; oversee; supervise." Random House College Dictionary (Rev. ed., 1980). This definition does not include "hiring and firing," which are in essence the powers which the United States trustee usurps. *But see Public Service Co.*, 89 B.R. at 1021 n. 9 (suggesting that the U.S. trustee has an "administrative function" of "making routine adjustments to the committee upon resignations, etc.").

More properly, until legislative filling of the statutory gap, a United States trustee should recognize that the Code grants no one the express power to replace, add or remove committee members. In such situations, the U.S. trustee should request that the court exercise its power under § 105(a) to "issue an[ ] order ... necessary or appropriate to carry out the provisions of ... title [11]," directing the U.S. trustee to do whatever it is he wants done but lacks the power to do. (For example, a three-member committee could suffer two resignations. The United States trustee would, of course, wish to appoint two replacements. Since he lacks statutory authority to do so, he should come to the court and argue that it is necessary for the court to issue an order directing the United States trustee to appoint replacement members in order to carry out the provisions of title 11—specifically the directive of § 1102(a) that there be a creditors' committee.) At least the court has § 105(a) power to fill the statutory vacuum. What does the United States trustee have?

tors known as the "Plaintiffs' Steering Committee" in the MDL 926 proceeding approaches the circumstances depicted in Rule 2007(a). Yet the United States trustee did not follow that rule's procedures. Nor was the Court given the opportunity to decide before now "whether the appointment of the committee satisfies the requirements of § 1102(b)(1) of the Code." *Id.*

Second, the Advisory Committee that drafted the rule noted that "[a]lthough this rule deals only with judicial review of the appointment of prepetition committees, it does not preclude judicial review under Rule 2020 regarding the appointment of other committees." Advisory Committee Note to Rule 2007 (1991). Thus the Rules Committee advises us that judicial review of the composition of official committees appointed by the United States trustee is appropriate.

■ As the above reasoning shows, there is no doubt that a court has the authority to alter committee membership. Indeed, even the United States trustee agrees that review of his appointments is within the Court's powers, arguing only that the standard of review is "arbitrary and capricious" as opposed to *de novo.* Comments, pp. 10, 12. As we shall see, however, the standard of review is not determinative.

Many courts believe that the United States trustee is an "agency" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"). *See, e.g., In re Gideon, Inc.,* 158 B.R. 528, 530–31 (Bankr. S.D.Fla.1993); *In re Vance,* 120 B.R. 181, 187 (Bankr.N.D.Okla.1990); *Sharon Steel,* 100 B.R. at 785. By arguing that the proper standard of review for the Court to utilize "is the arbitrary and capricious standard *applicable to administrative review,*" Comments,

p. 12 (emphasis added), the U.S. trustee apparently agrees that his office is an "agency" of the executive branch.

■ Thus, the U.S. trustee does not endorse the view of the first camp that the Court has no role at all regarding alteration of a committee. The Court's role arises, he says, under Rule 2020, which he concedes authorizes the Court to review United States trustee (in)actions.[10] He is, however, firmly in the third camp, by asserting that the only way a court can intervene is if it decides that the (in)actions of the United States trustee were "arbitrary and capricious". Comments, p. 10.

But it is not as simple as that, as even the U.S. trustee seemingly recognized. The United States trustee appropriately couched his statement of the proper standard of review with the following caveat: *"where adequacy of representation is not the issue,* [the correct standard of review] is the arbitrary and capricious standard...." Comments, p. 12. However, he failed to explain how a request for alteration of a committee can arise other than by a showing that the committee does not adequately represent creditors. And in this case, all five motions raise that very issue. Since inadequate representation *is* the issue here, what does the U.S. trustee propose as the proper standard? He concedes that "The Court has De Novo Review on the Issue of 'Adequacy of Representation.'" *Id.* (boldface in original).[11]

As we can see, therefore, it makes no real sense to say that a court is "reviewing the U.S. trustee's action" in appointing a committee under one or the other standard of review when the only issue is adequacy of representation, a question which the statute

---

10. Of course, the bankruptcy rules cannot create substantive rights. *See, e.g., In re Roberts,* 68 B.R. 1004, 15 B.C.D. 563, 16 C.B.C.2d 498 (Bankr.E.D.Mich.1987). Therefore, F.R.Bankr.P. 2020, which provides a procedural mechanism for a court to review actions or inactions by the United States trustee, does not recreate the statutory authority which was taken away in 1986. *Accord* Kenneth N. Klee, K. John Shaffer "Creditors' Committees Under Chapter 11 of the Bankruptcy Code," 44 S.C.L.Rev. 995, 1033 (Summer, 1993) ("Rule 2020 ... is merely a procedural device to challenge the U.S. Trustee's

actions, stating that such challenges are to be treated as contested matters under Rule 9014. The rule does not confer any substantive rights, nor does it establish an appropriate standard of review.").

11. He further asserts, however, that once the Court has determined that the committee does not adequately represent creditors, the only statutory remedy is to appoint an additional committee. I reject this notion for reasons discussed *supra* at pp. 130–32.

assigns to the court in the first instance. Further discussion on this non-issue is pointless.

■■■ Although the U.S. trustee did not explain how the request for alteration of a committee can arise other than when one complains about the adequacy of an existing committee's representation of creditors, another such circumstance exists in this very case. Suppose one of the persons named by the U.S. trustee to an official creditors' committee in a chapter 11 case is the U.S. trustee's brother-in-law, who is not himself a creditor, but a mere busy-body who likes to be where the action is. If someone objects to this person's membership on the ground that he is ineligible to serve, what if anything can the court do if the U.S. trustee rebuffs the objection? Can there really be no remedy? Fortunately, the law is not so toothless.

> When a court reviews an agency's construction of a statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.

*Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

> The final word on matters of law belongs to the courts, which may substitute their judgment for that of the agencies when necessary. Purely legal issues are fit for review if they will not be clarified by further factual development. . . .

.    .    .    .    .

**12.** Courts will grant the agency some deference on questions which are firmly ensconced within the agency's narrow expertise and therefore outside Congress' and the courts' more generalized abilities.

**13.** While this is not to say that a court cannot address the eligibility of members appointed to a committee by the United States trustee *sua sponte,* in this case the issue arose as a result of several motions to reconstitute the committees. For example, Mr. Silber, an attorney for 4,000 Australian tort claimants asked this Court to name him to the TCC. As a result, the issue of

Thus, where the issue on review concerns a construction of the statutes controlling the actions of the agency, the reviewing court is not bound by the agency's conclusions as to that construction.[12]

2 *Am.Jur.2d,* Administrative Law §§ 523, 524. *See also Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783; 2 *Am.Jur.2d,* Administrative Law § 525 ("[T]he court[ ] remain[s] the final authority on issues of statutory construction and must not stand aside and rubber stamp administrative decisions that [it] deem[s] inconsistent with a statutory mandate or that frustrates the Congressional policy underlying a statute.").

### III. The TCC Is Improperly Constituted As a Matter of Law

■■■ With regard to the TCC, this Court concludes that the United States trustee has acted outside the scope of his statutory powers.[13] In effect, he appointed his brother-in-law. As can be seen from the listing of the members of the TCC, it appears that its membership is made up of eight attorneys who themselves are not creditors of this estate. Section 1102(a)(1) provides that the United States trustee has the initial responsibility of appointing "a committee of *creditors holding unsecured claims . . . .*" (emphasis added). *See also* § 1102(b)(1) ("A committee of creditors appointed under subsection (a) of this section shall ordinarily consist of the persons, willing to serve, that hold the seven largest *claims against the debtor . . . .*") (emphasis added).[14] The eight attorney members are not "creditors holding unsecured claims" because none of them holds a claim.

Section 101(5) defines claim broadly as

his eligibility was presented. Since it is plain that he is not eligible to serve, the Court could not blind itself to the clear legal error made by the United States trustee in appointing eight others suffering the same disability.

**14.** Section 1102(b)(1) sets forth the requirements for committee membership. Despite the fact that § 1102(b)(1) includes the word "ordinarily," most courts have held that only the requirement that the committee consist of the creditors holding the seven largest claims is permissive. *See* Klee & Shaffer, 44 S.C.L.Rev. at 1005–06.

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

Notwithstanding the apparent plain language of this section, one can find cases in which a committee is comprised of representatives or agents of the actual creditors, as opposed to the creditors themselves. Examples of noncreditors that have served on committees in a representative capacity include attorneys, indenture trustees and unions. *See, generally,* Klee & Shaffer, 44 S.C.L.Rev. at 1014–16. However, in this case, the Court is concerned with the United States trustee's appointment of attorneys not merely as representatives, but as actual members of the TCC.[15]

Reported cases where it appears that attorneys served on an official committee include *VanArsdale v. Clemo (In re A.H. Robins Co.)*, 65 B.R. 160, 162–63 (E.D.Va.1986); *In re Celotex Corp.*, 123 B.R. 917 (Bankr. M.D.Fla.1991); *In re Johns–Manville Corp.*, 36 B.R. 743, 749 n. 3 (Bankr.S.D.N.Y.1984); *cf., In re M.H. Corp.*, 30 B.R. 266 (Bankr. S.D.Ohio 1983). However, in only one case, *Johns–Manville*, does it appear clearly that the committee included one or more attorneys who were the actual members. And that court was not happy with the results. *See Johns–Manville Sales Corp. v. Doan (In re Johns–Manville Corp.)*, 26 B.R. 919, 926 (Bankr.S.D.N.Y.1983). In other cases, *e.g., M.H. Corp.*, 30 B.R. at 267, the court refused to appoint an attorney to the committee as a representative of 16 different creditors. "[A]ny such appointment must be as representative of a specific creditor." *Id.*

In *Celotex*, 123 B.R. at 923, attorneys were barred from the committee altogether. There the court directed the U.S. trustee "to ensure the integrity of the committee process by requiring actual selected members of the Official Asbestos Personal Injury Creditors Committee to participate as contemplated by Section 1102 of the Bankruptcy Code", as opposed to those members' legal representatives. *Id.*

The United States trustee claims that the facts of *Celotex* cast doubt on its applicability to the present situation. Comments, p. 8 n. 1. However, this assertion is simply incorrect. A thorough reading of *Celotex* leaves no doubt that the concerns and findings expressed there are directly applicable here.

In *Celotex*, the leveraged buyout of a company resulted in the creation of two separate corporate entities, the Hillsborough Holdings Corporation and the Celotex Corporation. Afterwards, and as a result of the large number of asbestos claims filed against it, Celotex sought bankruptcy relief. The United States trustee then appointed a committee of asbestos claimants. Meanwhile, law firms representing some of the asbestos claimants formed a litigation group for the purpose of piercing Hillsborough's corporate veil. The litigation group hired two law firms to represent its interests in state court.

The committee of asbestos claimants then made an application to the bankruptcy court to employ these firms as its legal counsel and the United States trustee objected. The court denied the application on the grounds that the litigation group and the committee of asbestos claimants possessed interests that were adverse to one another. The court described the problem as follows:

First, courts have expressed concern that the vigor of the lawyer's representation of one client may be diminished in an effort to avoid antagonizing the other client. The second consideration relates to the

---

**15.** Of further concern, but not the subject of this opinion, is that the one member of the TCC who is not an attorney has a claim, if at all, that is so different from those of other tort claimants as to put in question her suitability as a member. Ms. Sybil Niden Goldrich apparently asserts a claim in this case for injury or illness allegedly result-

ing from the Debtor's breast implants even though it is uncontested that her claim was previously adjudicated against her. Surely if this is true, the United States trustee can find a claimant more representative of breast implant claimants whose claims are still undecided.

client's expectation of receiving the undivided loyalty of the lawyer. *American Bar Association Annotated Model Rules of Professional Conduct*, ABA Model Rule 1.7 (Conflict of Interest) (Comment on Loyalty to a Client), p. 73 (1984). "Loyalty to a client is also impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities and [sic—"or" in original] interests ... [t]he critical [question to consider is] the likelihood that a conflict will eventuate, and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose causes of action that reasonably should be pursued on behalf of the client."

*Id.* at 921 (quoting *In re Oliver's Stores, Inc.*, 79 B.R. 588, 594 (Bankr.D.N.J.1987)).

The court then took the opportunity to rectify problems which it perceived existed in the functioning of the committee of asbestos claimants. The court stated that "the present committee is made up of legal representatives of selected members of the committee and does not comply with Section 1102 of the Bankruptcy Code. These legal representatives have different fiduciary duties to their individual clients as distinct from that owed to the constituency of the committee." *Id.* at 922. Thus, the court's basis for removing the attorneys from the committee was twofold. First, allowing attorneys to serve on committees in a representative capacity is contrary to the statutory requirements of § 1102. *Accord In re American Fed'n. of Television & Radio Artists*, 30 B.R. 772, 775 (Bankr. S.D.N.Y.1983). Second, allowing attorneys to serve in this capacity places them in the unacceptable position of concurrently serving two masters with contrary interests.

The concerns expressed by the court in *Celotex* are no less applicable in this case. It is particularly appropriate to focus on Ms. Shainwald's ethical problems. She is said to be the primary representative of foreign tort claimants on the committee. Yet she also represents domestic breast implant claimants. If the question of how to allocate a debtor-provided trust fund between foreign tort claimants and domestic tort claimants arises, how will she vote?

It is well known that in preparing their many clients' cases for trial, some of the members of the TCC have made large investments of their own money. What if some of an attorney-member's clients wish to accept a small cash settlement of their claims rather than take a chance on a bigger pay-off (or nothing) down the road? The attorney could lose money on the cases if this option is pursued. Should he follow these clients' wishes and push for such a plan against his own self-interest? And what if some of his other clients oppose early cash-outs as an option? Should he obey their wishes or the first group's?

■ In his written "Comments", filed after the legality of the TCC's composition was first raised, the United States trustee discussed his reasons for appointing eight attorneys to the nine-member TCC. He explained that, typically, business creditors are appointed to committees of unsecured creditors because of their expertise and experience in the debtor's industry. However, he claims that the same reasoning does not apply to the tort claimants. In a patronizing and almost sexist way, the United States trustee made the startling assertion that among the hundreds of thousands of women who claim injury or illness arising from the Debtor's products, he could not find the minimal requisite of three to sit on a committee in this case. In the view of the United States trustee as expressed in these written comments, the

> tort claimants are made up of women with varying degrees of symptoms, illnesses and physical and financial disability. Some are emotionally distraught and indignant about the legal posture they are in; others have worked into a national network of similarly situated women; others still are overwhelmed by their losses and, interestingly, many that communicated directly with the United States Trustee are bewildered by and disenchanted with the legal system which they generally perceive exists to provide them their just remedy.

The United States Trustee also learned in his study that confidentiality was a big concern for many tort claimants. Literally thousands of women have sought and been promised anonymity with respect to their claims.

Comments, pp. 5–6. It is incredible that the United States trustee seeks to justify his failure to abide by the plain words of the statute on the ground that he could not find at least three women who were not so "emotionally distraught" that they could not serve on a creditors' committee.

In addition, the United States trustee totally overlooks the fact that the tort claimants in this case are not only breast implant claimants, but include claimants asserting injuries due to toe implants, temporo-mandibular joint (TMJ) implants, large joint implants, small joint implants, penile implants, testicular implants, chin implants, and implanted contraceptives. Some of the attorney-members of the TCC (Mr. O'Quinn, Mr. Gallagher, Ms. Cabraser, Ms. Branch and Ms. Shainwald), as a matter of fact, do represent clients with tort claims against the Debtor for products other than breast implants. The hundreds of thousands of implant recipients come from all walks of life. They could be homemakers, doctors, lawyers, or even the CEO of a Fortune 500 company. Some of these implant recipients may be perfectly suited for committee service. The United States trustee failed to mention any attempt to obtain an actual creditor from any one of these groups.

The United States trustee further argued that the attorneys he appointed to the TCC are the "partners" in their clients' "enterprise." The

> attorneys have savvy in this field—they know what the legal blueprint is and what evidentiary model has to be built to succeed on a personal injury claim. The injury is the plaintiffs'; transforming that into a compensable, liquidated and undisputed claim in this complex bankruptcy is the job of their lawyers and is an inextricable role the TCC is playing in this case. Tort litigants have relied upon their attorneys to act on their behalf as their attorneys-in-fact in the underlying state and federal

district court proceedings. The "playing field" should not be skewed in the bankruptcy by forcing a hypertechnical construction of § 1102.

Comments, p. 6.

The argument proves too much. In all cases the injury belongs to the creditor. This is true whether the injury gives rise to a tort claim, a patent claim, an antitrust claim, or even a construction contract claim. And naturally, it is the attorney for the creditor whose job it is to "transform[ ] that [injury] into a compensable, liquidated and undisputed claim...." And absent the assistance of an attorney, the businessperson cannot hope to transform her injury into a judgment or an allowed claim any more so than a plaintiff in a tort action. However, within the bankruptcy context, an individual creditor's attorney is not entitled to act in a legal capacity on behalf of all creditors. A creditors' committee may only employ legal counsel upon court approval. *See* 11 U.S.C. § 1103(b). The active role which the United States trustee apparently envisions these attorneys taking on behalf of the TCC is substantial in nature and very well may fall within the aegis of § 1103(b). More importantly, the "playing field" will not be skewed in this case by removing these attorneys as members. This is because the TCC is ably represented by many law firms duly appointed under § 1103(b).

In this Court's view, the policy which would prohibit an attorney representing multiple claimants from serving as a member on a committee clearly outweighs the contrary policies asserted by the United States trustee. *Accord,* Klee & Shaffer, 44 S.C.L.Rev. at 1011 ("As a practical matter, there may be merit in restricting committee membership to business persons with a direct economic stake in the outcome of the case, because such persons often would be the best suited to make economic decisions and to participate in the deliberative process. Business persons also could be less likely to prolong the case in an effort to run up fees."). This is not to say, of course, that a member cannot designate a representative to attend in his, her or its stead. While nothing in the Code expressly permits this, neither

does anything in the Code prohibit it and traditionally and logically it has been tolerated. Therefore, cases such as *M.H. Corp., supra,* have permitted a committee member to request that the member's attorney represent him or her at committee meetings. But that is a far cry from what exists here. Each of the TCC attorney-members represents numerous (hundreds or thousands of) claimants, and it is entirely probable that one of the attorney-member's clients would vote yea on a particular proposal, while another of his or her clients would vote nay.

■ We can discuss forever the policies for and against appointing attorneys to committees when the attorneys themselves do not have claims against the estate. But neither the United States trustee nor the bankruptcy court is invested with the power to write the law. Policy issues are resolved by Congress; and Congress did not write the statute in a way that allows the appointment of persons to a committee who themselves do not have claims against the estate.

Most courts have correctly and strictly read § 1102 according to its plain terms. For example, courts have limited membership on committees to "persons." In the past, before the 1994 Amendments, this meant that governmental units could not sit on committees because they were not "persons" as defined by the Code. *See, e.g., Mansfield Tire & Rubber Co. v. Pension Benefit Guaranty Corp. (In re Mansfield Tire & Rubber Co.),* 39 B.R. 974, 975 (N.D.Ohio 1983); *In re American Atomics Corp.,* 2 B.R. 526, 527 (Bankr.D.Ariz.1980). And generally, unions, have only been permitted to serve as members of a committee when the union itself possessed a claim against the estate. *See, e.g., In re Altair Airlines, Inc.,* 727 F.2d 88 (3d Cir.1984).

The United States trustee's attempt to read "or the persons' attorneys" into § 1102(b)(1) is improper for two reasons of statutory interpretation. First, the statute simply does not say that.

Second, the statute in essence used to say that but Congress intentionally deleted that language. Section 44(b) of the now repealed Bankruptcy Act, 11 U.S.C. § 72 (repealed) formerly stated:

Such creditors may, at their first meeting, also appoint a committee of not less than three creditors, which committee may consult and advise with the trustee in connection with the administration of the estate, make recommendations to the trustee in the performance of his duties, and submit to the court any question affecting the administration of the estate.

And "creditor" was defined under § 1(11) of the Act as including the actual creditor's "duly authorized agent, *attorney* or proxy." 11 U.S.C. § 1 (repealed) (emphasis added). In 1978, with the adoption of the Code, that language was dropped. Now, § 1102 speaks only of persons holding "claims" being appointed to a committee, and the definitions of "creditor" (§ 101(10)) and "claim" (§ 101(5)) leave no room for an "authorized agent, attorney or proxy" to fit.

This was no accident. "Congress was most concerned that effective creditor control under the Act had been subsumed by lawyers. It was widely believed that '[i]n practice, creditor control has become attorney control, and the bankruptcy system operates more for the benefit of attorneys than for the benefit of creditors.'" Judicial Misinterpretations of Creditors' Committees, 1 Bankr. Dev.J. 107, 110 (1984), quoting H.R.Rep. No. 95–595, 95th Cong.2d Sess. 1, 92 (1977) U.S.Code Cong. & Admin.News 1978 pp. 5787, 5963, 6053. Upon enacting the Bankruptcy Code, Congress intentionally changed the prior law which allowed lawyers too much control over creditors' committees. It also created a pilot project, the United States trustee system, which eventually spread almost nationwide, in part as an effort to do away with the cozy relations between attorneys and the judge in chapter 11 cases. How anomalous it is, then, that the United States trustee himself is now the engine for returning the lawyers to control over creditors' committees.

■ The United States trustee's action in appointing (at least) eight persons to the TCC who lack any claim against the estate clearly fell outside of the intended scope of § 1102(a). Therefore, it is entirely devoid of legal authority and the action is

entitled to no deference. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. An agency action may be overturned whenever it is "arbitrary, capricious, an abuse of discretion, *or otherwise not in accordance with the law."* 5 U.S.C. § 706(2)(A) (emphasis added); *see Vance,* 120 B.R. at 195. Alternatively, by relying upon an erroneous interpretation of law, the United States trustee abused his discretion. *Cf. In re Martech USA, Inc.,* 188 B.R. 847, 849 (9th Cir.B.A.P.1995). Accordingly, the Court will order the United States trustee to appoint a new TCC—made up of persons who have claims against the Debtor.

█ That this order is issuing ten months into the case is certainly unusual and unfortunate. However, this order will not, in fact, be disruptive. The TCC and the Debtor are not negotiating; they are warring. They are not getting closer to a consensual plan. As one witness testified: "The positions have hardened and widened.... We have not agreed on anything." Transcript of testimony of Carolyn Buck–Luce, Partner, Ernst & Young LLP, Financial Advisors to the TCC, March 7, 1996, p. 169, lines 17–18. *See also* TCC's "Motion ... To Terminate the Debtor's Exclusive Periods ..." filed February 15, 1996, page 3 ("there have been no meaningful plan negotiations whatsoever"); *id.* at 7 ("nothing has been accomplished by the Debtor to move this case toward resolution.").

Despite the Court's repeated entreaties for the parties to put aside their useless squabbling over issues that appear to be peripheral, and to enter serious discussions over the central problems, such as claims procedures, estimation protocols, etc., it is clear that these talks have not occurred. Though the TCC decries the Debtor's recalcitrance, it appears that both parties are subject to such criticism. The hearings on March 7 revealed that the TCC has had its own ideas of how claims processing and estimation should proceed since the first of the year yet kept them secret from the Debtor until March 5, when it filed its motion for an order adopting them. And though it now seeks to imminently file its own plan, it has not previously shared its concepts with the Debtor.

The most recent hearings provide a small taste of the acrimony building in this case. The setting was the Debtor's motion for a 60–day extension of exclusivity and the TCC's counter-motion to terminate the Debtor's exclusivity and to allow it, and nobody else, to file a plan. The major evidentiary issue at the hearing was the sanctity, *vel non* ,of out-of-court communications between and among parties in interest. In the course of one heated exchange, Dennis Meir of Kilpatrick & Cody, one of the four law firms hired by the TCC as co-general counsel quipped that he was "enjoying the consternation he's created." Transcript, p. 111, lines 13–14. Barbara Houser of Sheinfield, Maley & Kay, ,Debtor's general counsel, responded in the course of the following colloquy:

MS. HOUSER: Your Honor, I guess on behalf of the debtor if I might speak. I'm very disappointed that Mr. Meir is enjoying the consternation.

I think the abuse that the tort committee has subjected the debtor to in the conduct of the depositions, preparing for this hearing should not be countenanced by this Court. Before they ever filed for the extensive discovery that they noticed up, we said to them, we'll produce voluntarily more people than we're going to put on the stand, the only people we're going to put on the witness stand to testify at this hearing is that gentleman sitting in the witness chair, Mr. Newman.

But you want somebody from Dow Corning to depose, fine, we'll produce the CFO to you, Mr. Churchfield before he goes to Tokyo on business. Oh, no, that wasn't enough. They issue nine deposition notices. We want everybody on the executive committee of the board of directors, we want somebody that we'll designate besides Mr. Churchfield because he's not good enough. We don't know that yet because we haven't bothered to take his deposition yet.

We can't talk them into reasonable discovery in connection with a relatively simple, relatively straightforward 60 day extension of exclusivity. Nothing in this case gets done easily with the tort committee. Everything becomes protracted litigation.

And as I've said in my papers perhaps that's because it is a committee of lawyers who are trial lawyers and enjoy this process. But bankruptcy lawyers should not enjoy this process. So I guess I am disappointed that Mr. Meir is enjoying this because I think this is clearly not discoverable. I think this is an unfortunate display in this case.

I think that confidential settlement discussions ought to be permitted to grow to perhaps blossom into something to which everyone in this courtroom can be proud, a consensual plan. And if we can't have confidential discussions as Mr. Bernstein [Donald S. Bernstein of Davis, Polk & Wardwell, Counsel to the U/S CC] has said, that will never happen.

I must finally add that I find it ironic the tort committee has insisted that its confidential settlement discussions with the commercial committee not be disclosed to the debtor. The debtor has respected that. It's not tried to take discovery in a tit for tat basis with the tort committee with regard to their confidential plan negotiations.

We know that meetings have occurred. We've asked about those meetings. And the commercial committee has appropriately said to us, we were asked to maintain confidences, we will not breach those confidences. And the debtor has respected that in this case. And the debtor will continue to respect that in this case. We'd like equal respect given to us.

MR. MEIR: Your Honor, I feel I must respond with regard to aspects of the discovery. We did notice a number of depositions but agreed that only two of the depositions would proceed and that is exactly what happened.

But as is the debtor's custom in this case from the outset, the debtor filed four or five major motions on the same day, February 15th. They filed an estimation protocol which was that thick—

THE COURT: Let the record reflect that the counsel has his hands about 10, 12 inches apart.

MR. MEIR: Without any prior discussion with the tort committee regarding that, as well as other motions. We had to respond and file—we had to—we had to consider our strategy, determine what discovery to take, file a response within 15 days to all four of those—or five—I think there were five actually, motions. We did that.

We've subsequently worked out discovery so we took two depositions. We have proceeded in good faith, Your Honor. And obviously the debtor is concerned about what information comes out regarding the conduct of—of the discussions. We think it's extremely relevant to this case.

Transcript pp. 112–114.

Nearly every order of any significance has been appealed by somebody. The TCC, for example, is presently prosecuting appeals of orders: approving the Debtor's compromise with the Hartford insurers, No. 95–CV–73648, filed September 8, 1995; approving Debtor's compromise with Hoechst Marion Roussell, Inc. and Dow Chemical Company, No. 96–CV–70380, filed January 25, 1996; denying TCC's motion to disqualify a law firm from representing the Debtor under § 327(e), No. 96–CV–70813, filed February 22, 1996; and even an injunction against an attorney preventing him from slickly getting around the automatic stay which is intended to protect the estate. (P.S.: that attorney is one of the members of the TCC). *See* No. 95–CV–75222, filed October 12, 1995.

The Court, of course, respects the right of all parties to fully and effectively assert and defend their respective interests. And not infrequently the Court will candidly admit to doubt about particularly difficult issues and will urge litigants to appeal. The point of the foregoing discussion is not to criticize any of the parties for being zealous advocates. Instead, it is to highlight that reconstituting the TCC will not likely be disruptive of these proceedings. Additionally, a successful appeal of any one of these orders might very well set this case back for many months.

Inasmuch as I am ordering the United States trustee to appoint an entirely new TCC, the motions by the health benefit plans and the foreign tort claimants lose much of their bite. I will assume that, having heard the complaints of these constituencies, the

United States trustee will endeavor to better satisfy their requests for proper representation. I hasten to add, however, that for the same reason that the present committee members are disqualified from serving, so is Mr. Silber and the other foreign claimants' attorneys. The United States trustee will be directed to appoint creditors only—foreign and domestic breast implant claimants as well as men and women who are non-breast implant claimants.

■■■■ I make no special mention of so-called "subrogation tort claimants"—the health benefit plans—because it is not clear whether they have significant claims of any type at this point. While it can be assumed that at least a few persons who received health benefits from an insurance company might choose not to file a proof of claim in this case, it is difficult to believe that the number will be very great. And, as noted by the U/S CC, the motions by the health benefit plans give no indication as to how many policies provide for a right of subrogation against the alleged tort-feasor, as opposed to a right of reimbursement from the insured herself. This is important because the latter is not a claim against the estate. *See generally* 6 Couch on Insurance 2d, ¶ 61:29 (Rev. ed. 1983 and 1995 Supp.); *Block v. California Physicians' Svc.*, 244 Cal.App.2d 266, 53 Cal. Rptr. 51 (1966) (a right of reimbursement does not give an insurer rights against the tort-feasor). Additionally, the extent of an insurer's subrogation rights can vary widely from one state to the next.[16] The motions do

not say which states' laws govern the policies, nor do they discuss any of the state laws on subrogation. In fact, the motions do not contain documentation showing whether any of the policies even provide the insurers with either a right of subrogation or reimbursement. In short, the claims of the health benefit plans are presently so speculative as to make it difficult for a court to rule as a matter of law—or fact—that their rights to participate in this case would be substantially harmed if they are not permitted their own committee or a seat(s) on the TCC. The Court will leave this decision to the United States trustee.[17]

## IV. The U/S CC Adequately Represents the Interests of All Non-Tort Claimants Except the Physicians

■■■■ That leaves the motions of the vendors, the Union, and the physicians. While it is by no means crystal clear that all of the members of the U/S CC are creditors, I believe the proper reading of the United States trustee's ambiguous "Amended Appointment of Committee of Unsecured Creditors" document is that Messrs. Siegel (for Globe Metallurgical, Inc., a vendor), Cornell (for OSI Specialties, Inc., also a vendor) and Moloney (for Nippon Life Insurance Co.) are merely the persons designated by the committee members, Globe, OSI and Nippon Life respectively. And these attorneys, so far as the Court has been advised, represent no one else in this case but their respective committee members. Therefore, there appears to

---

**16.** Some states forbid subrogation of personal injury claims to the insurer as against public policy. *See, e.g., Gilmore v. Attebery*, 899 S.W.2d 164, 166 (Mo.Ct.App.1995) ("Missouri's public policy ... forbids the assignment or subrogation of personal injury claims to insurers"); *Allstate Ins. Co. v. Druke*, 118 Ariz. 301, 304, 576 P.2d 489 (1978) (insurer's medical expense repayment provision unenforceable as a subrogation of the insured's cause of action against the third party tort-feasor). Other states apparently require the victim to be fully compensated for losses arising from a tort before the insurer will be entitled to subrogation. *See, e.g., Rimes v. State Farm Mutual Auto Ins. Co.*, 106 Wis.2d 263, 272, 316 N.W.2d 348 (1982) ("[U]nder Wisconsin law ... one who claims subrogation rights ... is barred from any recovery unless the insured is made whole."). Still other states grant the insurer first priority to proceeds recovered from the tort-

feasor despite less than full recovery by the insured. *See, e.g., Peterson v. Ohio Farmers Ins. Co.*, 175 Ohio St. 34, 37, 191 N.E.2d 157 (1963) (subrogation provisions in the policy entitle insurer who has cooperated in the proceedings against the wrongdoer to priority in the proceeds recovered).

**17.** Since the TCC will be repopulated, the lateness of the plans' motion is irrelevant. Likewise, there is no point in deciding whether the movants had a duty to first request this relief of the United States trustee. What is not irrelevant, though, is the fact that they still have not filed a proper Rule 2019 disclosure. Numerous provisions of that rule were overlooked by the plans' counsel when she filed her "Appearance Of Counsel Pursuant to FRBP 2019 And Request For Notice" on October 10, 1995.

be no § 1102(a)(1)/(b)(1) reason to upset the membership of this committee. The question that remains, then, is whether there is a reason under § 1102(a)(2) to appoint an additional committee for any of these constituencies or, possibly to expand the membership of the U/S CC.

■ Most courts confronted with a motion for the appointment of a separate committee recognize that there is no bright line test for determining whether an additional committee should be appointed. Instead, the decision must be made on a case-by-case basis. *Hills Stores,* 137 B.R. at 5. However, courts have identified certain factors to consider. The factors most commonly cited are: the ability of the committee to function; the nature of the case; and the standing and desires of the various constituencies. *Hills Stores,* 137 B.R. at 5–6; *In re McLean Ind., Inc.,* 70 B.R. 852, 860 (Bankr.S.D.N.Y.1987). Courts have also recognized factors such as the potential for added cost and complexity as well as the point in the proceeding when the motion is made. *Ad Hoc Bondholders Group v. Interco, Inc. (In re Interco),* 141 B.R. 422, 424 (Bankr.E.D.Mo.1992); *Hills Stores,* 137 B.R. at 7–8. Finally, courts have considered the fact that all creditors are able to participate through § 1109(b) and have the potential to recover expenses through § 503(b). *Drexel Burnham,* 118 B.R. at 212; *Albero v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 68 B.R. 155, 163 (S.D.N.Y.1986), *appeal dismissed* 824 F.2d 176 (2d Cir.1987).

■ The test is, in essence, a balancing of interests and is by its nature quite case-specific. However, the test as generally articulated, is difficult to work with because it throws all the factors into one basket. It does not clearly delineate between those factors pertinent to adequate representation and those which are not.

The analysis is cleaner and makes more sense if it is divided into two separate components. This was the approach followed by the court in *In re Wang Laboratories, Inc.,* 149 B.R. 1, 2 (Bankr.D.Mass.1992), which stated that § 1102(a)(2) involves two inquiries. First, the court must determine whether appointment of an additional committee is

necessary to assure the movants are adequately represented. Second, if the answer to step one is yes, then the court must determine whether to exercise discretion by making the appointment.

Most cases acknowledge that the term "adequate representation" is not easily defined. *See, e.g., In re Beker Ind. Corp.,* 55 B.R. 945, 948 (Bankr.S.D.N.Y.1985) ("The statute affords no test of adequate representation, leaving the bankruptcy courts with discretion to examine the facts of each case to determine if additional committees are warranted."); *Hills Stores,* 137 B.R. at 5; *Interco,* 141 B.R. at 424. However, it is possible to articulate a more helpful standard.

In *Hills Stores,* the court stated that the Code does·not "mandate a committee must faithfully reproduce the exact complexion of the creditor body." 137 B.R. at 7. Instead, the Code requires "that conflicting groups of creditors have a·voice through adequate representation on a committee." *Id.* Further, "the ultimate aim is to strike a proper balance between the parties such that an effective and viable reorganization of the debtor may be accomplished." *Id.* The court in *Sharon Steel,* 100 B.R. at 777–78, stated that "adequate representation exists through a single committee as long as the diverse interests of the various creditor groups are represented on and have participated in that committee."

■ Although the existence of adequate representation will always require a case-by-case determination, these comments can be synthesized into a statement that provides greater assistance to a court making this determination: For a particular group of creditors to be adequately represented by an existing committee, it is not necessary for the committee to be an exact reflection of that committee's designated constituents. Instead, adequate representation exists if the interests of that particular group of creditors have a meaningful voice on the committee in relation to their posture in the case.

■ To determine that a committee adequately represents creditors, a court must consider all relevant factors against the back-

drop of this broad definition. Though they may be in slight variance with established case law, the following non-exclusive factors are the most pertinent: (a) the nature of the case; (b) identification of the various groups of creditors and their interests; (c) the composition of the committee; and (d) the ability of the committee to properly function.

The nature of the case is relevant because when Congress enacted the Bankruptcy Code in 1978, it recognized that in some large and complex cases a single committee could not adequately represent the interests of all creditors. Therefore, a large and complex bankruptcy case is more likely to have a need for an additional committee.

■ Although cases have not specifically mentioned factor (b) as a consideration, a determination of whether one group of creditors has adequate representation on a committee will entail a balancing of that group's interest against the interest of other groups on the committee. This, of course, cannot be done unless the various groups of creditors and their interests are known.

■ Though most courts have also failed to specifically list the composition or makeup of a committee as a factor to consider, this factor is essential. *Cf. McLean Ind.,* 70 B.R. at 861 ("[T]he need for a separate committee is to be found ... in the nature of the case and the composition of the committee."); *see also Drexel Burnham,* 118 B.R. at 212. A determination of whether there is proper balance, and thus adequate representation, on a committee requires an awareness of the committee's composition.

■ The final factor to consider when determining whether a committee is adequately representative is the ability of the committee to properly perform its functions. The word "function" obviously refers to the committee's role in a chapter 11 proceeding as set forth in § 1103(c). The problem is that a committee may function just fine, reaching consensus on all issues, and still not adequately represent a particular group of creditors. This can occur, for instance, if the committee is so dominated by one group of creditors that a separate group has virtually

no say in the decision-making process. Consequently, courts look to see whether conflicts of interest on the committee effectively disenfranchise particular groups of creditors. *See Sharon Steel,* 100 B.R. at 779; *In re Saxon Ind.,* 39 B.R. 945, 947 (Bankr.S.D.N.Y. 1984).

■ The second step in the analysis calls for the court to exercise discretion. This discretion derives from the language of § 1102(a)(2) where it states "the court *may* order the appointment...." The term "may" is a permissive word and will generally be construed to vest discretionary power when used in a statute or regulation. *Sverdrup Corp. v. W.H.C. Constructors, Inc.,* 989 F.2d 148, 151 (4th Cir.1993); *Beattie v. Farmers Home Admn. (In re Beattie),* 31 B.R. 703, 716 (Bankr.W.D.N.C.1983). Despite this general rule, and in certain contexts, some courts have construed "may" as mandatory. *See, e.g., United Hospital Center, Inc. v. Richardson,* 757 F.2d 1445, 1453 (4th Cir.1985). *See generally* 2A Norman J. Singer, Sutherland Statutory Construction § 57.16 (4th ed. 1984). However, a mandatory meaning will generally not be given the word "may" "unless the context of its use clearly indicates a purpose to use it in a mandatory sense." *Koch Refining Co. v. United States Dept. of Energy,* 497 F.Supp. 879, 891 (D.Minn.1980). Additionally, where the words "shall" and "may" are used in the same statute or regulation, as in § 1102(a), they are usually assigned their precise meanings. *Id.* (citing *Farmers' & Merchants' Bank v. Federal Reserve Bank,* 262 U.S. 649, 662–63, 43 S.Ct. 651, 656–57, 67 L.Ed. 1157 (1923)).

■ The Bankruptcy Code provides no rule of construction for the word (although it does state that " 'may not' is prohibitive, and not permissive"—§ 102(4). But the cases involving "may" in other sections of the Code—*e.g.,* §§ 105(a); 331; 554(b); 707(a); 721; 1112—seem to establish that once the court has made a finding which would authorize it to take an act, it need not take that act, but may, in the exercise of its

discretion, refrain.[18] Therefore, the Court need not order the appointment of an additional committee even if the present ones do not adequately represent the movants' interests.

The discretionary factors typically considered are: (a) the cost associated with appointment; (b) the time of the application; (c) the potential for added complexity; and (d) the presence of other avenues for creditor participation. *Hills Stores,* 137 B.R. at 7–8; *Interco,* 141 B.R. at 424. These factors are then balanced against the concern for adequate representation. Most courts have stated that these discretionary factors are only considerations and should not prevent appointment of a separate committee if it is otherwise justified by the facts. *See, e.g., Hills Stores,* 137 B.R. at 6. Nonetheless, bankruptcy courts have generally been reluctant to appoint additional committees and their decisions have placed considerable weight on these discretionary factors. *See, e.g., Johns–Manville,* 68 B.R. 155.

In most cases, the appointment of a separate committee will create added expense for the estate. At times this added cost can be substantial since "the appointment of additional committees is closely followed by applications to retain attorneys and accountants." *Wang Laboratories,* 149 B.R. at 4 (quoting *Beker Ind.,* 55 B.R. at 949). And additional committees appointed pursuant to § 1102(a)(2) appear to have the same rights as the unsecured creditors' committee appointed by the United States trustee. *See In re Wilnor Drilling, Inc.,* 29 B.R. 727, 730–31 (Bankr.S.D.Ill.1982).

These concerns can be minimized by the fact that the court has the ability to restrict the costs incurred by a committee. For example, a committee must obtain court approval to employ a professional pursuant to § 1103(b). *See In re Cumberland Farms, Inc.,* 142 B.R. 593, 594–96 (Bankr.D.Mass. 1992) (separately appointed committee of lenders not allowed to employ counsel at the estate's expense because that counsel's efforts would merely duplicate services provided by the unsecured creditors committee); *Drexel Burnham,* 118 B.R. at 211 (noting that in previous cases the court had "required separate committees to share accountants" out of concern for costs).

A discretionary factor on which courts place heavy weight is the timeliness of the motion. Courts are especially skeptical of motions filed after the debtor has filed a plan of reorganization. *See, e.g., Interco,* 141 B.R. at 424; *Hills Stores,* 137 B.R. at 7; *Public Service Co.,* 89 B.R. at 1020; *Johns–Manville,* 68 B.R. at 161–62.

Finally, courts have also said that the need for adequate representation through committee membership must be balanced against the availability of other avenues for creditor participation. Section 1109(b) allows any party in interest to raise and be heard on any issue in the case. Creditors also retain the right to vote on proposed plans. *Drexel Burnham,* 118 B.R. at 212. Additionally, any creditor that makes a substantial contribution to the reorganization can obtain reimbursement of its expenses in so doing, pursuant to § 503(b).

In terms of what types of additional committees may be appointed, § 1102(a)(2) spe-

---

18. The courts' powers under § 105 are "discretionary." *In re Commonwealth Cos.,* 913 F.2d 518, 527 (8th Cir.1990); *see also In re Cordle,* 187 B.R. 1, 5 (Bankr.N.D.Cal.1995) ("sanctions under § 105(a) are discretionary rather than mandatory."). "The award of interim compensation [under § 331] is discretionary with the court, and may, under appropriate circumstances, be denied." 3 *Collier on Bankruptcy* ¶ 331.02 (15th ed. 1996). "Section 554(b) gives the bankruptcy court discretion in ordering abandonment. . . ." *In re K.C. Machine & Tool Co.,* 816 F.2d 238, 244 (6th Cir.1987). "Section 707(a) vests the Court with the authority to decide whether or not a case should be dismissed."

4 *Collier on Bankruptcy,* ¶ 707.01. "[C]ourt approval [under § 721] is discretionary." 4 *Collier on Bankruptcy,* ¶ 721.02; "Since the court has discretion to convert or dismiss [under § 1112] it may do neither." 5 *Collier on Bankruptcy,* ¶ 1112.03[d], n. 17; *In re Jartran, Inc.,* 886 F.2d 859 (7th Cir.1989).

It is "the 'normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.'" *Commissioner v. Lundy,* 516 U.S. ——, ——, 116 S.Ct. 647, 655, 133 L.Ed.2d 611, 626 (1996) (quoting *Sullivan v. Stroop,* 496 U.S. 478, 484, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (1990)).

cifically mentions an equity security holders' committee and § 1114(c)(2) refers to a retired employees' committee. Courts, however, have not limited themselves to these two specific types of committees, and instead have appointed numerous types of additional committees based upon the special needs of each particular case. Some examples of additional committees that have been created include: trade and industry competitors; secured creditors; priority creditors; subordinate note holders; employee creditors; property holders; and tort claimants. *See* Peter C. Blain and Diane Harrison O'Gawa, *Creditors' Committees Under Chapter 11 of the United States Bankruptcy Code: Creation, Composition, Powers, and Duties*, 73 Marq.L.Rev. 581, 592 (1990) (and cases cited therein).

■ The burden is on the party seeking an additional committee to prove inadequate representation. *Johns–Manville*, 68 B.R. at 158; *Beker*, 55 B.R. at 949. The Union and the vendors failed to carry this burden.

■ The movants claimed that the case is large and complex and is therefore worthy of additional committees. The respondents agreed that the case is large but are equivocal on its complexity. *Compare* "United States Trustee's Objection to Motion for Order Requiring Appointment of Official Unsecured Vendors' Committee," filed July 31, 1995, p. 4 (implying that the case is not complex) *with* the United States trustee's Comments, p. 4 (describing this case as "highly complex"). The Court finds that the case is large and complex and is the type of case that can justify additional committees.

■ The creditors seeking their own committees are from groups of vendors, employees and tort claim co-defendants. The principal interest of the vendors is identical to that of all other unsecured creditors: to maximize the recovery from the estate. The vendors' secondary interest may (or may not) differ from the secondary interest of the other unsecured creditors. The U/S CC is comprised of five institutional lenders and two vendors. In some cases, institutional creditors may be willing to take cash now even at the cost of passing up the potential for more cash later, thereby jeopardizing the chances for a successful reorganization. Such an objective will frequently conflict with trade creditors' interests in having a reorganized company around to sell goods and services to at a later date. *See, e.g., Altair Airlines,* 727 F.2d at 90 (Trade creditors "may sometimes prefer to forego full payment for past sales in hopes of preserving a customer, while lenders may prefer liquidation and prompt payment.") But the vendors have not shown that this situation obtains in this case. Even more basic, the vendors have not explained why the two vendors already on the committee cannot sufficiently present their views and protect their interests. Consequently, the vendors' motion will be denied.

■ The Union has not shown that it or any of its members or retirees even possess claims against the estate. The Union's position is akin to that of a customer who fears that the Debtor might not perform a prepetition supply contract. Of course, if the Debtor rejects any of its executory contractual obligations to the Union or its members or retirees, they will then have claims. The Union can then argue that the U/S CC does not adequately represent their interests. At present, however, the best way to describe the Union's interest is in not becoming a creditor.

To the extent that the Union actually holds some type of actual claim—a point it was never able to establish—it certainly is capable of asserting it on its own. Finally, if the Union were entitled to its own committee, who would serve with it? Is there a sufficient number of other unions involved with the Debtor to comprise a committee? And why "break up" the Union into its constituent members only to reformulate them into a committee of employees when to collectivize employees is the purpose of a union in the first place? For these reasons, the Court concludes that the Union's motion must be denied.

■ The toughest problem is the one posed by the physicians. The physicians' claims are contingent in that they would have no claims against the estate if they are never

found liable to tort plaintiffs suing them for implanting the Debtor's products. But if liability is fixed, they will assert contractual indemnity, common law indemnity and contribution claims against the estate. These claims, even if the contingency is removed, are disputed by the Debtor.

Given that committees have been ordered for future claimants, priority claimants and others whose ability to currently vote a claim is problematical or non-existent, it appears that there is no legal reason why a committee for persons with contingent claims cannot be ordered. The TCC, of course, is established for the benefit of an entire class of creditors whose claims are all vigorously disputed, and therefore, unless otherwise ordered, will be denied a vote on the plan. *See* § 1126(c) (only classes of creditors holding "allowed claims" can accept or reject a plan); § 502(a) ("a claim ... is deemed allowed, unless a party in interest ... objects."); F.R.Bankr.P. 3018(a) ("Notwithstanding objection to a claim ... the court after notice and hearing may temporarily allow the claim ... in an amount which the court deems proper for the purpose of accepting or rejecting a plan.").

The physicians have no representatives on the committee. The physicians make up only a small part of the total number of unsecured creditors who are not represented by the TCC. It would seem therefore that the physicians lack sufficient numbers to justify a member on the committee. But by dollar amount, the physicians' claims might constitute a sizable percentage of the total unsecured claims.

The U/S CC assured the physicians that if they are found to have actual claims, the committee will honor its fiduciary duty to them. But in actual practice, positions will be quite muddled. First, the tort claimants have sued the physicians. The interests of the Debtor as co-defendant with the physicians and of the commercial creditors stand with the physicians against the tort claimants. If the physicians' liability is established, the Debtor has an interest in showing that the action of the physicians alone caused the harm to the tort claimants and vice versa. The commercial claimants' interest is with

the Debtor but against the physicians at this point. And there currently exists a lawsuit pertaining to the physicians' attempt to establish that the Debtor's insurers owe them a defense and indemnity under the so-called "vendor's endorsement" clause of the Debtor's policies. *See Zurich Insurance Company v. Dow Corning Corporation, Robert W. Wood, Jr., M.D., et al.,* A.P. No. 95–2045; *see also* "Motion [of Texas Liability Trust, Medical Protective Company, American Physicians Insurance Exchange, Texas Medical Liability Insurance Underwriting Association, Insurance Corporation of America, Stephen Le Sauvage, M.D. and Ted D. Huang, M.D.] to Modify the Automatic Stay With Respect to Insurance Policies Issued by Zurich Insurance Company 11 U.S.C. 362(d)(1)," filed August 14, 1995. The Debtor and the insurers dispute the physicians' interpretation of these policies. The interest of the commercial creditors in that litigation is difficult to discern.

"[T]he chief concern of adequacy of representation is whether it appears that different classes of debt ... may be treated differently under a plan...." *Drexel Burnham,* 118 B.R. at 212. In this case, a plan that delays payments to all commercial claimants until the results of the thousands of lawsuits against the physicians are known would obviously be unacceptable to the vendors and institutional lenders. But since the posture of the physicians is so different from the other non-tort unsecured creditors, it is likely that any plan will treat the claims differently. The U/S CC is in no position to negotiate for the physicians' special treatment.

Can the committee perform its statutory functions with respect to the physicians? It is common for a committee to take a position contrary to that expressed by one of its members. *See In re Central Medical Center, Inc.,* 122 B.R. 568, 570–71 (Bankr.E.D.Mo. 1990) (bondholders' committee had standing to object to plan confirmation despite overwhelming support for the plan by its constituents); *American Fed'n,* 30 B.R. at 775–76 (committee member was entitled to oppose debtor's application to extend the exclusivity period in spite of the fact that the committee

did not oppose the application). In fact, since committees typically consist of creditors holding a variety of viewpoints, a certain amount of conflict is inherent within the committee structure. *Hills Stores,* 137 B.R. at 6; *Sharon Steel,* 100 B.R. at 779; *McLean Ind.,* 70 B.R. at 861. Moreover, "[t]he inclusion of [conflicting groups] within one committee may . . . facilitate the negotiation of a consensual plan." *Hills Stores,* 137 B.R. at 7. Therefore, that the U/S CC might have interests adverse to the individual claims of the physicians is unremarkable.

But the physicians will have a collective interest in the estimation and resolution of the claims of the tort claimants and in the formulation of a plan of reorganization. And the U/S CC is not at all well situated to defend those interests in that kind of setting.

Although it is a close question, the Court determines [19] that the U/S CC does not adequately represent the interest of the physicians. Should the Court nonetheless deny the physicians their own committee?

■ The cost to the estate will be minimal. At the oral argument of the physicians' motion, they offered to bear their own expenses for professionals. *See* statement of Garrett L. Cecchini of Wright, Robinson, McCammon, Osthimer & Tatum, attorney for the Medical Protective Company, on behalf of the consortium of physician defendants, transcript of "Motion for Order Requiring Appointment of Committee of Physician Claimants," p. 138, lines 20–21 ("We'll eat the costs. We just want the status to sit down and be represented.")

The motion, made within a month of the formation of the committees, was not untimely, especially given the status of the case today.

The case is already complex. The physicians are here; their attorneys are at every hearing and take active part in nearly everything that happens. Giving them *de jure* status will not further complicate matters.

There are, of course, other avenues for the physicians to participate. They are organized into a consortium and, through the efforts of able counsel, have been effective in presenting their legal positions to the Court. But ten months into the case and after repeated assurances by the Debtor that it would consult with the official committees and the unofficial groups such as the physicians, all parties agree that the physicians have never yet been a party to discussions. Although their legal positions are defended in court, the behind-the-scenes work which is so essential to a successful chapter 11 case is stymied by the physicians' lack of official committee status.

Accordingly, the Court will grant the physicians' motion for the appointment of an additional committee to represent their interests.

■ If the 1986 repeal of the courts' power to appoint committees means anything, it means that once a court has found the need for an additional committee, it must leave the job of naming the members of that committee to the U.S. trustee. *Public Service Co.,* 89 B.R. at 1021 n. 9. Therefore, the order will merely provide that the United States trustee shall appoint a committee of physician claimants.

To summarize, the TCC is improperly constituted as a matter of law and so the United States trustee must appoint a new one. The U/S CC does not and can not adequately represent the interests of the physician claimants. Therefore the physician claimants will be granted their own committee. But it has not been shown that the U/S CC inadequately represents the interests of the vendors or the Union. Thus, the motions of these two groups will be denied. The motions of the health plans and the foreign tort claimants are essentially moot since the United States trustee will be appointing a new TCC and they have the opportunity to persuade the U.S. trustee to include them in the new committee.

An order consistent with this opinion shall be entered forthwith.

---

**19.** Not knowing whether adequacy of representation is a fact to be found or a matter of law to be concluded, but suspecting that it is a mixed question of fact and law, I punt by using the term "determines".

***ORDER REGARDING VARIOUS MO-
TIONS FOR ORDERS TO APPOINT
ADDITIONAL COMMITTEES OR TO
MODIFY THE COMPOSITION OF
EXISTING COMMITTEES***

For the reasons stated in the Opinion of even date,

**IT IS HEREBY ORDERED** that:

1. Because the existing Tort Claimants Committee is improperly constituted as a matter of law, the United States trustee shall appoint a new Tort Claimants' Committee consistent with the requirements of § 1102(b)(1);

2. The motion of the Unofficial Vendors' Committee requesting the appointment of an Official Vendors' Committee is hereby **DENIED**;

3. The motion of the United Steelworkers of America requesting the appointment of an employment-related creditors' committee is hereby **DENIED**;

4. The motion of the Medical Protective Company requesting the appointment of an Official Committee of Physicians' Claimants is hereby **GRANTED**;

5. The motions of the various Health Plans and Foreign Tort Claimants are moot, since the United States trustee will be appointing a new Tort Claimants Committee. Consequently, these motions are hereby **DENIED**.